Good morning ladies and gentlemen. Our first case for argument this morning is the Central States Pension Fund against Univar Solutions. Mr. Shaw. May it please the court. Mr. Shaw for appellant Univar. The collective bargaining agreement at issue to the extent it was still operative despite the fixed date one year extension signed in 2020 allowed for only two possibilities as the fund itself acknowledged in writing Univars January 2021 notice sought either one to terminate the CBA under section one, the Evergreens clause, or two to continue the CBA subject to revisions under section two, the revisions clause. The question here is which one and the answer is clear termination Univar in direct response to the union's preceding notice did not include the critical second element of sections to revisions clause necessary to continue the existing CBA. It stated desire to. Forgive me. Mr. Shaw, if the extension agreement included a hard termination date of March 28, 2021, then what was the purpose of universe. January 2021 letter. Right. Your honor. So I think it's important to remember that universe January 2021 letter came in direct response to the union's letter that came a few days before that. And what the union said in its notice is we would actually like to continue the existing CBA with some changes. So to avoid any ambiguity about what Univar wanted, which is termination Univar sent its notice. So I think that's the posture in which it happened. But even if your honor thinks that the the initial extension agreement wasn't a hard and fast termination, at least the court should look at universe January 2021 notice in light of the collective bargaining agreement at issue. This is not the collective bargaining agreement at issue in trans service. Right. Trans services agreement only had section one. And if you look at the termination article, it's an appendix page 54. This one has two sections. Right. Trans service only had section one, which said, if you want to cancel or terminate, send a notice saying that. And this court, of course, said you got to be clear in that notice. But here we have a section two. And if the section two is going to do any work, then the parties have to pay attention to it. You have to interpret section one in light of section two. And what section two says is if a party wants to propose changes and everyone agrees here that Univar wanted to change things, then. If it wants to continue the agreement, it has to quote advice also advise that such party desires to continue this agreement. Univar did not do that. That conspicuous omission of a desire to continue the existing agreement means that they have terminated. So, in other words, once you propose terminations under the terms of this CBA, if you want to continue it, you have to say so. Otherwise, you just put a big red X under section two or cut it out of the agreement and the district courts position and the funds position is exactly the same whether or not section two exists. They would say it doesn't matter whether Univar says it wants to continue the agreement. It continues unless they've said terminate and only terminate. So, that's our key submission is this case is not like trans service, trans service, Woods County, all of this court's precedents have said. And in fact, the fund told the US Supreme Court in opposing cert in trans service, you have to read each collective bargaining agreement according to its terms and the central defining feature of this one. Unlike trans services, it has a section two. It has a revisions clause that tells you when you want to make changes, yet not terminate what you have to do. And that is you have to say you want to continue the agreement. There is no dispute from anyone here that Univar did not say it wanted to continue the agreement. So, by seeking changes, but omitting that second element of the revisions clause, advising that they wanted to desire to continue the CBA, Univar necessarily conveyed an intent to terminate regardless of the success of negotiations. And that is the fundamental difference between the rationale of this court and trans service, where they said, we don't know what the party wants to do if negotiations aren't successful, right? Maybe it wants to terminate. Maybe not. That's not clear enough. Again, if we had the CBA and trans service, I would sit down and tell you we lose here, but I don't see how you can read a 54 and come to any other conclusion. Unless you ignore section two, and that's what the fund wants you to do. It doesn't want you to look at section two. But if you look at section two, it says it in black and white. If you're proposing modifications, and you want to continue the agreement, you have to advise that you want to continue the agreement. The January 2021 notice, it's really just one sentence, doesn't have that in it, right? It says, we propose termination or modification, request to meet and confer for purposes of negotiating a successor agreement. What's the point of the word modification? What does that mean? Should we just read that out of the letter? No, I think you can read it to mean its natural meaning. So we'll accept for purposes of this argument, Your Honor, that the fund is right. Modification meant they wanted to propose changes, right? But then that puts you to section two, right? It says, if you have the agreement, this is an appendix 54, Your Honor, right? It says, yeah. So if you want to negotiate changes or revisions, so that's modification, and you want to continue the agreement, you shall quote, advise that such party desires to continue this agreement, but also desires to revise or change terms. So the modification gives you half of it. It gives you that they want to do changes, but it doesn't give you the other half. Let me push on that a little bit. Why would it not give you the other half? If you're suggesting that you want to propose changes to the agreement, why does that not suggest that you want to continue the agreement? Because section two says advising that such parties desire to continue the agreement, but also desires to revise or change the terms or conditions of such agreement. So that seems to suggest to me that a modification of the agreement could mean that the agreement continues. It doesn't have to be a separate agreement. Right. And so, Your Honor, that was the problem in Transervice, right? They said, we don't know what you mean by modified. Maybe that means you want to continue it or maybe not. But here the parties expressly contracted to include section two. And so section two says, if you want to modify, if you want to revise or change conditions, you've got to say you want to continue it if you want to avoid termination. So what would the January letter have said? Please consider this written notice that the company proposes the modification or termination of the agreement and request to meet and confer with the union for the purposes of negotiating a successor agreement. And what should it have said? It should map on to the language of section two that Unibar desires to continue this agreement regardless, right? But doesn't it say that when it says request to meet and confer with the union for the purposes of negotiating a successor agreement? A successor agreement is different, right? This revisions clause is about continuing. It says continue this agreement, right? That's what section two says. So basically, so what happens, Your Honor, in these cases is unless they're just going to renew in virtually every situation, one of the parties is going to ask for changes. And so the whole ballgame is, hey, if the negotiation over those changes don't work out, does that mean we terminate the existing one? Or do we just keep it in force and keep going? And what Transervice says is we don't know which one of those you wanted to do, and so it's not a termination, right? But in this agreement, the parties contracted for section two that says, hey, if you want to propose changes, but you want to continue the agreement regardless, you need to say that. It says you have to advise them of both things, desiring changes and desiring to continue the agreement. They've conspicuously only done one, and Your Honor, if you're looking for an example of what you would have to say, look at the union's preceding notice a few days earlier to which Univar was responding. They said exactly both things. They said we want to do changes, but we want to continue the existing agreement. So the union tracked section two because they didn't want termination. Univar said, okay, we're open to termination or modification, but they don't say we want to continue the existing agreement regardless. So the union's notice is exactly the example that you're looking for, Judge Kirsch, of what you're supposed to do under this party's CBA. And remember, the ballgame in these cases is answering the question under the terms of the CBA. The court said this in Transervice. It said it in Wood County. It said it in American Maze. And the fund told the U.S. Supreme Court, hey, look, don't worry. Transervice is going to affect virtually no other party because of its unique terms of its CBA. Every CBA is different, and the main way in which CBAs are different is whether they include something like section two. There are a lot of variations on section two. You could have the section two like in American Maze. You can have the section two like here. The one here, by the way, is common. A lot of the NLRB cases that we cited, South Bay Mechanical and all of those, have exactly this language. And the NLRB precedent is clear. When you ask for changes but you don't say you continue the agreement, then it terminates. Mr. Shah, would the language until March 28, 2021, in the extension agreement, have referred to the fact that the three revisions would only be good until March 28, 2021? So, yeah, so this is, Your Honor, you're addressing now our threshold argument, right, about whether the extension did it. And so, Your Honor, what you just articulated is what the district court held, right, that that termination date only applied to the modifications. And that's what the fund argued to the district court. The fund no longer argues that on appeal, right? As we pointed out in our opening brief, it doesn't say that the three modifications run until March 28. If you look at the text on page 123 of the appendix, it says they've agreed to extend, quote, the collective bargaining agreement until March 28, 2021, right? And so it's the entire agreement that's extended to that fixed date, not, as the district court held, just the three modifications. And so, Your Honor, you're right. If you just read the plain text of the extension, we win, and you don't have to get to the argument that I've been spending my first 10 minutes on. But you're right. I mean, that is clearly correct. It does not just apply to the modifications. District court held it. The fund now backs away from that argument, even though they made it below. I realize that I've hit the three-minute mark into my rebuttal time, if I may reserve the time, unless there are further questions. Certainly, Counsel. Okay. Thank you, Your Honor. Mr. Herring. May it please the court. Andrew Herring for Appellees. I want to start with something that the opposing counsel just mentioned about whether the notice refers to an intent to continue the contract. I want to point out that in Univar's reply brief, they claim that this court in trans service allegedly relied on the fact that there was a revisions clause, the second clause we've been talking about in trans service, and that that clause didn't require, quote, an expression of desire to continue the current contract here, whereas the revision clause here did. That's on page 16 of their reply. But I want to emphasize that this court didn't reference the revisions clause in trans service. There wasn't one. Instead, in that part of trans service, the court was discussing the alleged termination notice, not the CBA. Specifically, the court was discussing the district court's erroneous conclusion that the mere fact that the notice didn't mention wanting to continue the current contract was sufficient to make the notice a termination notice. Sorry, excuse me.  Once the fund received notice of the new CBA on June 21st, 2021, why did it wait until a year later to notify Univar that Univar was required to continue making contributions? To answer that, I'd first like to say that it's not that simple. We received the notice in June 2021, but Univar makes it sound like at that point, we knew that there would be a complete withdrawal if the notice was good. But it's not that simple. Univar closed down three facilities, fired all the union members before we got that notice in June 2021, but they still had two facilities with CBAs that expired after 2021. And we didn't learn that they had shut those down as part of their scheme to effect a complete withdrawal in 2021. We didn't learn that they shut those down until November 21. But getting more to the question, you know, it is not our duty to assist an employer in a scheme to minimize their withdrawal liability. That's not our duty. And Univar is a sophisticated global entity. They have advisors. They have attorneys. They know just as well as we did the law. There is nothing in the law that says, you know, contracting parties have to be nice to each other or that contracting parties have to help each other avoid or, excuse me, execute schemes to minimize liability to another party. And Univar continues to claim, oh, we were trying to help the employees. But they gloss over the fact that in order to execute their scheme to effect a 2021 complete withdrawal, they fired 24 union members shutting down the facility because they had CBAs that expired after 2021. And they admit this. They admit in the district court that they had a scheme to try and shut down, you know, all their contribution obligations in 2021. And it's not the fund's duty and not the fund's prerogative to aid an employer in a scheme such as that. Indeed, MEPA itself indicates that a transaction to evade or avoid a withdrawal liability is to be ignored for purposes of assessing and calculating withdrawal liability. That's 1392C. So putting all those things together, I believe I've answered your question. The other thing I wanted to touch on or one other thing I wanted to touch on is that Univar keeps coming back to this notion that it wasn't a notice under Section 2. So it must have been a notice under Section 1. Setting aside, you know, the questions from the court, which are good ones, asked about, you know, well, then what did modify it? Why did they say terminate or modify and things like that? And I think that argument by Univar completely turns Transervice on its head. Their argument is, hey, we didn't meet Section 2, so we must have met Section 1. But that's not the law. That's not what Transervice says. Transervice requires an unequivocal notice of an intention to terminate under the language of the CBA. And when you say— Then what do you make of American Mays? American Mays, I would share the same thought on that that you had in Wood County, Your Honor. Simply put, the clause there, the duration clause there was different. But that, of course, is exactly Univar's argument here. The termination clause is different from the one in Transervice. You have to look at each of these agreements as it is, right? So you can't cite Transservice as applying to every possible agreement. So how about if we look at American Mays? How about that one? The distinction in that case is, as Your Honor noted in Wood County, the distinction in that case— No, no, no. The court as an institution speaks through its opinions. Excuse me. As the court noted in Wood County, the duration clause there provided that if it was a broad-based notice to modify, one that didn't mention specific terms, then that was to be treated as a termination clause, as a termination notice. If it was a specific notice to modify that mentioned specific terms, then it was to be treated as a notice to modify. Here, that language is not present in this CBA. It says you either terminate, and that's Section 1, or you send a notice saying you want to modify the current CBA. Would you admit that if Univar had just left out the two words modification or in the January 2021 letter, it would have given notice of termination? I believe they would have a far stronger case for that, and it would be a much tougher case for us to argue, because that is, I think, the core of our argument, that trans service requires unequivocal notice to terminate, and by saying terminate or modify, you're equivocating. So is it, let's see, is it your position that a court's interpretation of that letter, a letter that's usually, you know, written by non-lawyers, must be so stringent that the word modification erases the later words that Univar wanted to negotiate a successor agreement and that we should also ignore all the other evidence that the parties intended to terminate the contract and did, in fact, terminate the contract? Because it seems rather harsh medicine for including the word modification, or maybe you don't think so. Well, I think there's two aspects to that question, right? The first aspect was, you know, whether, in terms of reading the notice itself on its four corners, whether emphasizing, you know, the fact that it says modification or isn't that, is that being too strict? I don't think so. I mean, first of all, the idea that it mentions a successor CBA, they come and say that that means, you know, it's necessarily a completely new CBA. They don't cite anything for that, and it's a loose term that could also mean a modified version of the old CBA. So I think by assuming that other language in there, or I think appellants are trying to get this court to assume that the other language in there indicates a notice to terminate, but I think it's all vague. And in terms of, you know, looking to the policy reason why courts interpret these strictly, the Trans Service Court was clear that, you know, employers or unions might, you know, play a game of saying, oh, we're going to draft a vague notice that says terminate or modify. If we're able to agree and collective bargaining goes well, we'll then turn around and say, oh, there's a notice to terminate. If it doesn't go well, and in this case the employer just wants to revert to what they had before, they'll then argue it was a notice to modify. And that doesn't give either the contracting parties or the fund enough that the clarity is required or entitled to receive under 29 U.S. Code 1145. You know, I see your point, of course, that Univar may have failed to use the proper language to trigger either a modification or termination. But if that is the case, what was the January 2021 letter notifying the union of? I think, I guess the first thing I would say in response to that is Trans Service requires unequivocal notice to terminate. And I would be speculating as to what was in the employer's mind when they sent that. But, you know, as they noted in Trans Service, an employer may very well want to play the wait-and-see game and see if the bargaining goes well after and spin the notice in the way they want after that. And that may have very well been what happened, but I think we're pretty forthcoming in our briefs that, well, we don't really know why this notice was vague. We're not going to speculate as to that. There's nothing in the record as to why it was vague. But that's putting the cart before the horse there, asking an irrelevant question, in my view, because the Trans Service court was clear that, well, it has to be unequivocally a notice to terminate by its plain language. Can I touch on the extrinsic evidence question you asked? Certainly. Thank you. Yeah. You know, Trans Service also touches on that issue. The point that they make is that, first of all, 29 U.S. Code 1145 prohibits consideration of extrinsic evidence in this context. And the second point they made is, you know, even if you were to consider the extrinsic evidence, the question is what was in the employer's mind when they sent this notice. All the extrinsic evidence is weeks or I think it's all even months later. How are you going to tell what was in the mind of a corporation? You ask, what was in the employer's mind? Univar has how many thousand employees? You can't even tell what's in the mind of, oh, anybody in the audience today. A fair question. How are you going to tell what's in the mind of thousands of people at the same time? Right. And perhaps I'm misstating Trans Service a little. Yes. It's an absurd way to look at things. We look at what's written down, not try to guess at what's in people's heads. Right. I guess I'm just trying to explain, you know, the Trans Service Court's reasoning for why you wouldn't look to extrinsic evidence. And there they pointed to, they said, well, yeah, the parties eventually agreed to a new CBA. But we don't know that that was the intent of, in that case it was. Well, you're back to looking in people's heads. You have to look at what people wrote down. The law of contracts is objective. The law under ERISA is objective. Yes. And pivoting to that, if you will, I mean, here, Trans Service is clear that under ERISA 29 U.S. Code 1145, the notice has to be an unequivocal notice to terminate. Under when the Evergreen Clause has a certain form. Right. And I would contend that here there is the form of Section 1. They talk a lot about Section 2. I don't understand, by the way, why parties can't terminate a collective bargaining agreement any time they want. The Evergreen Clause deals with unilateral termination. We had bilateral termination in June. Why isn't that effective no matter what happened in March? There's maybe a somewhat subtle distinction here that I'll try to explain. The parties, the contracting parties, the union and the employer, can always terminate mid-contract. But our trust agreement provides- But the fund took the position that the old contract was effective until its expiration date without regard to the bilateral termination. I'm not sure we stated it that way. If we did, it's slightly incorrect, and let me explain. The point is that our trust agreement, which they indisputably agreed to be bound by, prohibits mid-term terms in new CBAs that cut off the obligation to get tribute. So our argument is a little more finely tuned than that. It's that, yes, they could negotiate a new CBA. We didn't reject that CBA. It's now in place, and we terminated them in 2022 as a result. But our trust agreement, which they agreed to be bound by, provides that a term in a new contract that purports to retroactively eliminate the obligation to get tribute is no good and will not be honored. It's in our trust agreement, and that clause even references including extension of the obligation to get tribute through operation of an evergreen clause. So I only have 18 seconds left, but I just say, for the reasons I mentioned, we ask that this court affirm. Thank you. Thank you, Counsel. Anything further, Mr. Shaw? Yes, Your Honor. Just two points, if I may. First, just to go back to what Transervice said. This is reading from its conclusion. This court wrote, the starting point for our analysis is whether termination of a collective bargaining agreement is the terms of the contract, including the evergreen clause's requirements for termination. Here, those requirements made clear that to terminate, one of the parties to the contract needed to express an active desire for the agreement to end. In contrast, you look at the collective bargaining agreement here, which the parties contracted for the opposite result. Under Section 2, Section 2 says, if you are seeking revisions, you need to express your desire to continue the agreement to avoid termination. The fund still has not given through its appeal briefs or its oral argument what work Section 2 is doing in this agreement. Their position is exactly the same if you took Section 2 out of the agreement. That is not how courts read contracts. We have to read Section 1 and Section 2 together and look at the notice in light of Section 1 and Section 2. And again, it has to mean something that Univar omitted the request to continue the agreement. Under their view, it's the exact same result whether Univar says, we want to continue the agreement and have changes or we don't want to continue the agreement and have changes or just says we want to have changes and is silent. That, again, renders Section 2 superfluous. That simply can't be right. As you noted, Your Honor, American Maze has a revisions clause. It is true. It had different language, but the court didn't just stop when it read amend and terminate. It looked at the revisions clause and said, oh, in that revisions clause, in order to continue the agreement, the parties had to amend specific terms only because they didn't amend specific terms only, it terminates. The parallel argument here is you have to say you want the agreement to continue. It doesn't do that. Therefore, you get termination. The last thing I'll say in response to Judge Rovner, you asked about the fund not notifying for over a year. Not only did the fund sit on its hands for over a year, but they stopped billing Univar for the fund contributions. That's exactly the opposite of transervice. This court pointed to the fact that the fund was continuing to bill the employer, and so that lent credence to the fund's position that the termination notice wasn't clear. Here, both Univar and the union, the union wanted this result. They negotiated for it. They both said, hey, we've terminated and are withdrawing. They both sent that to the fund independently. The fund ignores it, stops billing Univar, and then over a year later, after it's too late to solve the double withdrawal. Counsel, we have your position. Thank you very much. The case is taken under advisement. Our next case for argument is the Wisconsin Central Railroad against the Surface Transportation Board.